**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

CHRISTIAN VILLAGRAN                                                          PETITIONER
ADC #148442

V.                                    NO. 5:13CV00035 SWW/JTR

RAY HOBBS, Director,                                                        RESPONDENT
Arkansas Department of Correction

## <u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>

### <u>INSTRUCTIONS</u>

The following recommended disposition has been sent to United States District

Judge Susan Webber Wright. Any party may serve and file written objections to this

recommendation. Objections should be specific and should include the factual or legal

basis for the objection. If the objection is to a factual finding, specifically identify that

finding and the evidence that supports your objection. An original and one copy of

your objections must be received in the office of the United States District Clerk no

later than fourteen (14) days from the date of the findings and recommendations. The

copy will be furnished to the opposing party. Failure to file timely objections may

result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new,

different, or additional evidence, and to have a hearing for this purpose before the

United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.    Why the record made before the Magistrate Judge is inadequate.

2.    Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.    An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Room A149
Little Rock, AR 72201-3325

## I. Background

Petitioner, Christian Villagran, who is currently incarcerated at the Cummins Unit of the Arkansas Department of Correction, has filed a 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus. *Doc. 2*. Respondent has filed a Response, *Doc. 4*, and Petitioner has filed a Reply, *Doc. 9*. Thus, the issues are joined and ready for

disposition.

Before addressing Petitioner's habeas claims, the Court will review the relevant facts and procedural history of the case.

On February 18, 2009, Carlos Estrada was shot and killed outside a store in southwest Little Rock. Later that evening, Petitioner was taken into custody and questioned by Little Rock Police Department ("LRPD") officers regarding the shooting.

Petitioner was subsequently charged with first-degree murder. (R. 28.)[1] Before his trial, he filed a motion to suppress statements he made during the February 18, 2009 custodial interrogation. He claimed that the statements: (1) were made in the absence of counsel and without a valid waiver of his rights; and (2) were not made freely or voluntarily. (R. 21-24.) On December 16-17, 2009, the trial court held a suppression hearing. *Doc. 5* ("Hrg. Tr.").

At the hearing, Detective Tommy Hudson testified that, when he learned Petitioner spoke no English, he asked for assistance from Alma Glasscock, a Spanish-speaking LRPD officer. Hudson also contacted the Mexican Consulate, which sent a representative, Eric Levy. Hudson testified that he wanted to make sure, before he

---

[1]The record of Petitioner's pretrial and trial proceedings was filed as *Doc. 11*.

began questioning Petitioner, that Petitioner understood his *Miranda*[2] rights. (Hrg. Tr. at 72-73.) Hudson, Glasscock and Levy were all present during the entire interview with Petitioner. (*Id.* at 79, 101.) The interview was video-recorded and audio-recorded, and the video was played for the trial court during the suppression hearing. (*Id.* at 75-76, 80, 230.)[3]

At the hearing, Glasscock testified that she is fluent in Spanish by means of her Mexican heritage, and that she often translates for the LRPD. (*Id.* at 96-98.) In response to Glasscock's questions during the interview, Petitioner stated that he could read and write Spanish, but not English, and had a sixth grade education. (*Id.* at 179-80, 187-88.) Glasscock showed Petitioner a document that had the *Miranda* rights written in both Spanish and English. (*Id.* at 103-04, 174, 179-80.) She read him the first three rights in Spanish: (1) he had the right to remain silent; (2) anything he said could be used against him in a court of law; and (3) he had the right to talk to a lawyer and to have a lawyer present during questioning. (*Id.* at 180-81.) Petitioner told Glasscock he understood these rights. (*Id.*)

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]The transcript of Petitioner's suppression hearing has four exhibits: (1) the *Miranda* rights form, (Hrg. Tr. at 174); (2) the video-recording of the interview, (*id.* at 176); (3) a verbatim transcript of the interview, with the Spanish portions untranslated, (*id.* at 152-53, 203-26); and (4) a second transcript, with all Spanish translated into English by a certified interpreter who reviewed the verbatim transcript and listened to the audio recording, (*id.* at 151-53, 178-201).

After asking Glasscock if he could read the form himself, Petitioner read aloud the fourth right, in Spanish: "In case you can't afford to employ your own attorney, the court will appoint one to you at no cost to you. You also have the right to have him present during the questions if you want." Petitioner said he understood what he was reading. (*Id.* at 181.)

Glasscock then read, in Spanish, the fifth question on the form: "Do you understand each one of the rights just explained?" Petitioner orally answered yes, and, where the form indicated "Si" (yes), he wrote "Entiendo" (Spanish for "I understand") and his initials. He signed the section of the form acknowledging that he understood his *Miranda* rights, and Glasscock signed as a witness. (*Id.* at 105-06, 155, 174, 182-83.)

At the suppression hearing, Glasscock testified that it is her practice to go over the *Miranda* rights until the person understands them and, if a person is unable to understand, she ends the conversation. She testified that Petitioner never indicated that he did not understand what they were talking about. (*Id.* at 107-09.) Glasscock testified that, if at any point a suspect asks for an attorney, the procedure is to "stop the interrogation." (*Id.* at 114, 125.) She said that, during the reading of the *Miranda* rights, Petitioner did not ask for an attorney. (*Id.* at 139-40.)

After going over each of the *Miranda* rights, Glasscock then told Petitioner they

were proceeding to the second part of the form, entitled "Waiver of Rights." The

following exchange occurred:[4]

| | |
|---|---|
| Glasscock: | Having the rights in mind, will you talk to me? Can you read it ... in Spanish please? |
| Villagran: | Yes, yes, yes. Having these rights in mind, do you want to talk to me? Can I ask a question? ... [I]f I put down yes, they won't appoint an attorney for me? |
| Glasscock: | Do you want an attorney, yes or no? |
| Villagran: | Well yes. |
| Glasscock: | You do want an attorney? |
| Villagran: | Or do I talk to you? No - no, I mean, what, what - what's the benefit that I have? |
| Glasscock: | **Okay, So he - what he is wanting to know right now is whether or not to have an attorney, but I need to re-explain his *Miranda* rights to him right now about making that decision on his own right now.** ... I can't tell you if you want a lawyer or if you don't want a lawyer. What I can tell you ... If you want to talk to us and explain what happened today it can help you, but I don't know for safety. |
| | **I did tell him that if he wants to talk to us it may help him, but I can't guarantee it.** |
| Hudson: | **Just make sure he understands, that he understands that these are his five Miranda rights, and that we ... can't give him advice on whether he should or should not contact an attorney. ... [M]ake sure he understands, he has the right to** |

---

[4]English statements are written in boldface.

> **have an attorney if he wishes to have an attorney. He has to make that decision; we can't make that decision for him. ...**
>
> ...

Glasscock:   Do you understand that right now ... those *Miranda* rights we can't give you ... decision, help make a decision whether you want an attorney or not? But we can explain this again. Any [time] that you want [unintelligible] silent, you can do it if you think you have the right to not answer, that stating that you wish to have silence, right?

Villagran:   M-hm.

....

Glasscock:   Okay. I can't tell you now if you need that to have an attorney or you don't need that to have an attorney. That is a decision that you have to say.

> **... I told him that we can explain these five Miranda rights to him again. I can't give him the advice of whether or not he should have a lawyer or shouldn't have a lawyer. I told him that ... if he deems feasible to talk to us and he should not – he feels uncomfortable to answer any questions, he can always exercise his rights, maintain his [unintelligible].**

Villagran:   Okay, I'll talk to you.

Glasscock:   You do want to talk to us?

Villagran:   Yes.

(*Id.* at 183-86.) Hudson told Glasscock to go over the rights with Petitioner again.

Pointing to the *Miranda* form, Glasscock asked again, in Spanish, "With these rights in mind, do you want to talk to me?" Petitioner replied, "Yes." (*Id.* at 186-87.)

-7-

At the suppression hearing, Glasscock testified that, although Petitioner answered "well yes" when she asked him if he wanted an attorney, she believed that, based on his mannerisms and the context of their conversation, he was asking a question, as if he was unsure of what she was asking him and what he should do. (*Id.* at 124-27, 130-31, 138-40.) Because he had not previously asked for an attorney when they went over each of the *Miranda* rights, she asked him to clarify if he wanted an attorney. (*Id.* at 139-40.) She testified that, if she believed Petitioner had wanted an attorney to be present during questioning, she would have stopped the interview immediately. (*Id.* at 140.)

After Petitioner's oral assertion that he wanted to talk to the officers, Glasscock asked him to place his initials beside "Si", in response to the question on the form, "Having these rights in mind, will you talk to me?" Petitioner then signed his name, acknowledging, "I understand my rights and know what I am doing." (*Id.* at 106-07, 174, 186-87.) Glasscock and Hudson also signed the rights-waiver section of the form. (*Id.* at 107, 174.)

Before Det. Hudson began questioning Petitioner, Levy went over the *Miranda* rights again with Petitioner:

> Levy:      [A]re you really sure that you understand your rights? ... In the sense that you have the right to keep quiet and not to talk if your attorney is not present. Or you have the right to – you can make the decision to waive that right and talk voluntarily, no?

| Villagran: | What would you recommend that I do? |
|---|---|
| Levy: | I, well I can't give you a recommendation from the consulate either. ... What is really important is for you to understand that you have the right not to speak ... if you don't want to, until your attorney is present. And that you make the decision based on your, your... |
| Villagran: | My judgment. |
| Levy: | Your judgment, exactly. |
| Villagran: | No, well, I'll talk. |

(*Id.* at 189.)

Hudson then asked Glasscock and Levy if they both agreed that Petitioner was waiving his rights. (*Id.* at 190.) Glasscock replied affirmatively; however, Levy questioned Petitioner further:

| Levy: | [D]o you understand ... that you are voluntarily waiving your right to have an attorney present? |
|---|---|
| Villagran: | To an attorney, okay. |
| Levy: | So then you do – you do understand? |
| Villagran: | Yes. |
| Levy: | Is that your decision? |
| Villagran: | Yes. |

(*Id.* at 190.)

Hudson proceeded to question Petitioner, through Levy as the translator,

regarding his suspected involvement in the shooting that had occurred earlier that day.[5] (*Id.* at 191-201.)

At the close of the suppression hearing, the trial court denied Petitioner's motion to suppress. (*Id.* at 250.)

In 2010, Petitioner was tried before a circuit court jury in Pulaski County, Arkansas, on the charge against him. (R. 270-937.) His statement, given to Det. Hudson on February 18, 2009, was not introduced in the state's case-in-chief. It was, however, used to impeach Petitioner's trial testimony that he "felt a little threatened" and that he shot only after the victim took steps toward him and "started to come at [him]," which was inconsistent with what he told Hudson. (R. 630, 642-45, 655.) In his testimony, Petitioner admitted – consistent with his statement to Hudson – that he shot the victim in the leg, "kind of lost it" and fired more shots, ran from the scene, threw down the gun, and then went inside a nearby house. (R. 646-51.) The state then recalled Det. Hudson as a rebuttal witness. Hudson testified that Petitioner's statements during the custodial interview did not "jive" with Petitioner's trial testimony that the victim was coming at him in an aggressive manner. (R. 671.)

---

[5]In the statement, Petitioner said that, when he came out of the store, one of his friends was involved in a fight. Petitioner saw the victim getting out of a car and thought he had a gun. Petitioner said he shot the victim in the leg to scare him, but did not mean to kill him. Petitioner said that, after his first shot, he "started shooting like crazy" and did not remember how many times he fired. (Hrg. Tr. at 195-96, 200-01.)

The jury convicted Petitioner of first-degree murder, and sentenced him to 480 months of imprisonment.[6] *Doc. 4-2.*

On direct appeal to the Arkansas Court of Appeals, Petitioner argued that the trial court erred: (1) in failing to suppress his statements made after invoking his right to counsel; and (2) in excluding a witness who would have testified that the sole eyewitness was biased. *Doc. 4-3.* On December 14, 2011, the Arkansas Court of Appeals affirmed Petitioner's conviction. *Villagran v. State*, 2011 Ark. App. 769. Regarding the first issue, the court held:

> Villagran claims that he invoked his right to counsel and was not equivocal in his invocation of his right. From our reading of the translated interview, whether Villagran invoked his right to counsel is an extremely close question. However, we do not need to settle the issue in order to resolve the matter before us. The State did not use the allegedly ill-gotten statement in its case in chief. Arguably, this was done because the State, too, realized the potential constitutional infirmities of the statement after an attempt was made by Villagran to invoke his right to counsel.
>
> The statements, even if obtained in violation of Villagran's right to counsel, can still be used to impeach his contradictory testimony. In other words, his trial testimony will not go unchallenged simply because his pretrial statements were inadmissible. In *Kansas v. Ventris*, 556 U.S. 586 (2009), the Supreme Court noted "it is one thing to say the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can provide himself with a shield against contradictions and untruths. Once the defendant

---

[6]The jury sentenced Petitioner to 420 months on the murder conviction, along with a 60-month enhancement for using a firearm during commission of a felony.

testifies in a way that contradicts prior statements, denying the prosecution use of the traditional truth-telling devices of the adversary process is a high price to pay for vindication of the right to counsel at the prior stage." *Id.* at 589–90.

However, citing no authority, Villagran argues that the State improperly used his pretrial statements to impeach his trial testimony because the prior statements "tended to significantly diminish his credibility." However, this is the precise point of impeachment and goes to the very heart of the Supreme Court's logic in the *Ventris* case. Recognizing the limitations of his argument, Villagran more specifically claims that the State's impeachment of him (via the allegedly infirm custodial statements) should have been limited to the precise words in any denial or assertion he made. This hair-splitting argument, however, is not supported by any citation to authority or argument explaining why his credibility should not have been questioned, except to say that his credibility was "the most important aspect of trial." We do not consider an argument, even a constitutional one, when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken.

*Id.* at 2-3.[7]

On February 4, 2013, Petitioner initiated this habeas action, arguing that his constitutional rights were violated when the trial court refused to suppress his custodial statements, which were made after he had unequivocally invoked his *Miranda* right to discontinue the interrogation until he had an attorney present. He also argues that his statements were not given willingly or freely because the officers

---

[7]On January 11, 2012, the Arkansas Court of Appeals denied Petitioner's petition for rehearing. He then filed a Rule 37 petition for post-conviction relief in the trial court, raising claims not relevant to the issues in this § 2254 habeas action. The trial court denied relief, and Petitioner did not appeal. *See Docs. 2, at 3; 4, at 1.*

continued to "badger" him after he invoked his right to counsel. He argues that, because his statement was involuntary, it was not admissible for impeachment or any other purpose.

For the reasons discussed below, the Court recommends that Petitioner's claim be denied.

## II. Discussion

Where a state court has previously adjudicated a claim on the merits, a federal habeas court may grant habeas relief for the same claim only where the state court adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[8] "It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011)).

The United States Supreme Court has repeatedly held that a defendant's

---

[8]No factual findings are at issue in this case, and Petitioner does not argue that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

statement may be used at trial for impeachment purposes, even though that statement may be inadmissible as direct evidence in the case-in-chief because it was obtained from the defendant in violation of his constitutional rights. *Kansas v. Ventris*, 556 U.S. 586, 594 (2009) (defendant's statement to a jailhouse informant, elicited in violation of the defendant's Sixth Amendment right to counsel); *Michigan v. Harvey*, 494 U.S. 344, 350-52 (1990) (defendant's statement to officers after invoking his Sixth Amendment right to counsel); *Oregon v. Hass*, 420 U.S. 714, 722-24 (1975) (defendant's statement obtained after he requested a lawyer, in violation of Fifth and Fourteenth Amendments); *Harris v. New York*, 401 U.S. 222, 225-26 (1971) (defendant's statements obtained without his being advised of Fifth Amendment *Miranda* right to counsel); *see also Walder v. United States*, 347 U.S. 62, 64-65 (1954) (evidence obtained in violation of Fourth Amendment).

In addressing Petitioner's argument in his direct appeal, the Arkansas Court of Appeals cited *Ventris*, which relied upon the earlier, clearly established United States Supreme Court precedents. The trial transcript confirms that Petitioner's custodial statements were not admitted into evidence, but were used only to impeach his partially contradictory trial testimony.

In this habeas action, Petitioner argues that his custodial statements were "involuntary" and thus were not admissible for impeachment or any other reason. He

argues that the voluntariness issue "must be addressed," and has not been decided by any court.[9]

The Supreme Court has held that "truly coerced" statements are never admissible at trial for any purpose. *Ventris*, 556 U.S. at 590 (citing *New Jersey v. Portash*, 440 U.S. 450, 458-59 (1979)); *Harvey*, 494 U.S. at 351 ("We have mandated the exclusion of reliable and probative evidence for *all* purposes only when it is derived from involuntary statements.") (emphasis in original); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) ("*[A]ny* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law.") (emphasis in original).

In determining voluntariness, the ultimate test is whether the statement is the "product of an essentially free and unconstrained choice by its maker," or whether his "will has been overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). In making this assessment, a court

---

[9]Petitioner did not argue, at the state court suppression hearing or in his direct appeal, that his statements were involuntary, and neither the trial court nor the Arkansas Court of Appeals made an express finding on the issue. (*See* Hrg. Tr. at 242-47, 250; *Doc. 4-3*, at 2-4.) Rather than contending that the voluntariness aspect of Petitioner's habeas claim is procedurally defaulted, Respondent briefly addressed the merits of that argument. (*Doc. 4, at 5 n.2*.) Accordingly, this Court also has addressed the merits of Petitioner's claim that his statements were involuntary. *See Perry v. Kemna*, 356 F.3d 880, 886-87 (8th Cir. 2004) (holding that while habeas claims regarding the validity of the petitioner's *Miranda* waivers and subsequent confessions were "probably" procedurally barred, the court need not decide that issue because the record showed that his waivers were voluntary, knowing and intelligent, and that his confessions were voluntary).

must consider the totality of the circumstances – "both the characteristics of the accused and the details of the interrogation."[10] *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Coercive police activity is a "necessary predicate" to a finding that a confession is involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

The record of the suppression hearing shows that, under the totality of the circumstances, Petitioner's statements were voluntarily given. The record is devoid of any evidence that the police officers resorted to physical or psychological pressure, violence, threats or promises, improper interrogation tactics, lengthy questioning, trickery, deceit or intimidation to elicit statements from Petitioner. When Det. Hudson learned that Petitioner spoke no English, he obtained the assistance of a Spanish-speaking officer and took the additional precaution of obtaining a representative from the Mexican Consulate. Petitioner was questioned a few hours after being taken into custody, and the interview itself lasted less than thirty minutes.[11] The two LRPD

---

[10]Factors considered by the courts include: the degree of police coercion, including the use of any physical punishment; the length of detention; the length, location and continuity of the interrogation; whether the defendant was advised of his constitutional rights to remain silent and to have counsel present during custodial interrogation; and the defendant's maturity, education, physical condition, level of intelligence, and mental health. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993); *Schneckloth*, 412 U.S. at 226.

[11]According to the trial testimony, police received the call about the shooting at 5:46 p.m. (R. 619.) At the suppression hearing, Hudson testified that Petitioner was taken into custody "within minutes" after the shooting, and was taken directly to the LRPD. (Hrg. Tr. at 92.) The interview began at 10:07 p.m., and ended at 10:30 p.m. (*Id.* at 178.) About half of the interview consisted of the *Miranda* rights explanation by Glasscock and Levy. (*Id.* at 179-91.)

officers and the consulate representative were present during the entire interview.

Petitioner was informed of his *Miranda* rights before any substantive questions were asked. The transcripts and video-recording show that no time elapsed between the time Petitioner signed the rights-waiver and Hudson began questioning him. Petitioner was orally informed three times of his right to have counsel present during questioning, he read aloud the right himself, and he signed the written form affirming that all the rights were explained to him. Petitioner repeatedly indicated, orally and in writing, that he understood his rights and wanted to waive them and talk to the officers.

Petitioner was twenty-four years old at the time of the interview. Although he reported only a sixth-grade education, he said he could read and write, and he read aloud from the *Miranda* form with no difficulty. He asked questions, appropriately responded to directions in filling out the form, wrote on the form, and signed his name twice. The video-recording shows that Petitioner was not handcuffed or restrained in any way, and sat across a table from Hudson, Glasscock and Levy. He talked freely, and appeared calm and cooperative. He did not appear to be in any physical or emotional distress. Hudson testified that Petitioner seemed coherent and did not appear to be under the influence of any drugs or alcohol.[12]

---

[12]Hrg. Tr. at 77-78.

The only reason Petitioner cites for finding his statements to be involuntary is that Glasscock "continued to badger him even after he unequivocally responded 'yes' to her question, 'Do you want an attorney?'" *Doc. 9, at 1-2*. He argues that anything after his affirmative response "should be considered involuntary." *Doc. 2, at 6*.

As explained, a determination of voluntariness is made based on the totality of the circumstances, not just one factor. The persistence of Glasscock appeared to be her efforts to clarify his rights, to make sure he understood them, to determine what he meant by "well yes," and to ensure that *she* understood what he was saying. This exchange occurred during the *Miranda* rights explanation, before any substantive questions were asked. Thus, Glasscock's conduct is more likely indicative of sound police procedure rather than "badgering" Petitioner into waiving his rights. *See Davis v. United States*, 512 U.S. 452, 461-62 (1994) ("Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.").

Nothing in these circumstances shows that Petitioner's "will has been overborne and his capacity for self-determination critically impaired."[13] Thus, the Court finds that, under the governing Supreme Court precedents, Petitioner's statements were *not*

---

[13]*Cf. Mincey*, 437 U.S. at 398-401 (statements were *not* voluntarily given where defendant was interrogated in the hospital, was under the influence of drugs and in severe pain, and repeatedly requested an attorney).

the product of coercion or were otherwise involuntary as a constitutional matter. Because the statements were voluntary, the Arkansas Court of Appeals determination that the statements were admissible for impeachment purposes was not contrary to, or an unreasonable application of, clearly established Supreme Court law as reiterated in *Ventris*.

Finally, Petitioner argues that this Court "must address" the question of whether Petitioner invoked his right to counsel, which the Arkansas Court of Appeals characterized as "extremely close," but "refused to settle." *Doc. 2, at 7*. Under the governing Supreme Court precedents relied upon by the Arkansas Court of Appeals, this question need not be resolved where a voluntary statement was used only for impeachment purposes.

Thus, the Arkansas Court of Appeals' adjudication – that Petitioner's statements were admissible for impeachment purposes regardless of any constitutional infirmities – was not contrary to or an unreasonable application of any federal law.[14]

---

[14]Petitioner argues that the Arkansas Court of Appeals decision is contrary to the Supreme Court's decision in *Chavez v. Martinez*, 538 U.S. 760 (2003). *Doc. 9, at 2-3*. *Chavez* is inapposite. *Chavez* addressed the question of whether a criminal suspect, who is never prosecuted or tried for a crime, can state a viable 42 U.S.C. § 1983 claim for damages against a law enforcement officer for allegedly violating the suspect's constitutional rights to be free from coercive interrogation and self-incrimination. *See People v. Neal*, 72 P.3d 280, 282 n.1 (Cal. Sup. Ct. 2003) (*Chavez* "has no bearing on this case, which is a criminal proceeding in which defendant challenges the admissibility of his two confessions"). Furthermore, *Chavez* did not address the use of a voluntary statement for impeachment purposes at a criminal trial.

Accordingly, Petitioner's habeas claims are without merit and should be dismissed.

### III. Conclusion

IT IS THEREFORE RECOMMENDED THAT this 28 U.S.C. § 2254 Petition for a Writ of Habeas Corpus, *Doc. 2*, be DENIED, and this case be DISMISSED, WITH PREJUDICE.

IT IS FURTHER RECOMMENDED THAT a Certificate of Appealability be DENIED. *See* 28 U.S.C. § 2253(c)(1)-(2); Rule 11(a), Rules Governing § 2254 Cases in United States District Courts; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

DATED THIS 12th DAY OF September, 2014.

_____
UNITED STATES MAGISTRATE JUDGE